RECEIVED

SEP 3 0 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| JOHN MANTIPLY, et al. | CIVIL ACTION NO. 10-1855 |
| -vs- | JUDGE DRELL |
| UNITED STATES OF AMERICA, et al. | MAGISTRATE JUDGE KIRK |

## REASONS FOR JUDGMENT

The Court conducted a bench trial in this matter on April 29, 2013. For the reasons set forth below, compiled after careful review of the evidence, argument, and briefs of counsel, this Court renders judgment as follows: in favor of Plaintiff, John Mantiply, and against Defendant, the United States of America, in the amount of $330,565.71 plus costs as provided by law; in favor of Plaintiff, Melissa Sue Mantiply, and against Defendant in the amount of $5000 plus costs as provided by law; and in favor of Plaintiff, Casey Adam Mantiply, and against Defendant in the amount of $2000 plus costs as provided by law.

## I.    Background

Plaintiffs, John Mantiply and Melissa Sue Mantiply, both individually and on behalf of their son, Casey Adam Mantiply, brought this suit against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), seeking damages for the allegedly substandard care John Mantiply received at the Veterans Affairs Medical Center in Alexandria, Louisiana ("VAMC") in connection with his May 21, 2008 knee surgery.  The surgery was performed by Dr. Joseph I. Hoffman at the VA facility at Alexandria, Louisiana.  This facility is actually located in Pineville, Louisiana.

John Mantiply first filed an administrative tort claim for $750,000 on his own behalf, as well as an administrative tort claim for $100,000 on behalf of his son, with the Department of Veterans Affairs on March 23, 2010. (Joint Exh. 1). Melissa Mantiply also filed an administrative tort claim for $100,000 on the same date. (Joint Exh. 1). However, the Veterans Administration did not make any finding for a period exceeding six months. Plaintiffs then filed the instant suit on December 19, 2010, naming the United States of America ("Government") as Defendant. (Doc. 1).

On June 8, 2011, the Government informed Mr. Mantiply that his treating orthopaedic surgeon, Dr. Hoffman, was not actually employed by the VAMC, but rather, was an independent contractor. Accordingly, Plaintiffs filed an Amended Complaint on June 9, 2011, adding Dr. Hoffman as a defendant to the suit. (Doc. 11). By Judgment signed October 2, 2012 (Doc. 39), we adopted Magistrate Judge James Kirk's Report and Recommendation (Doc. 34), finding that Dr. Hoffman was a VAMC employee at the time of the alleged acts of malpractice. On February 25, 2013, we issued an Order dismissing Dr. Hoffman from the suit without prejudice. (Doc. 47).

In the Complaint, Plaintiffs allege that John Mantiply sustained permanent and disabling injury to his left knee as a result of the medical negligence of Dr. Hoffman and the VAMC. The Government filed an answer denying all allegations of negligence and asserting several affirmative defenses, including that Plaintiffs' recovery is limited to the amount claimed administratively, that Plaintiffs' recovery cannot exceed the amount set forth in the Louisiana Medical Malpractice Act, La. R.S. § 40:1299.41, *et. seq*, and that Plaintiffs' recovery should be reduced by the percentage of Mr. Mantiply's own fault.

2

(Docs. 4, 13). This ruling follows a one-day bench trial on the merits held on April 29, 2013, at which extensive evidence was presented by both sides.

## II.   Facts and Evidence

### A.   Mr. Mantiply's Medical and Employment Histories

John Mantiply, a 44 year-old military veteran, was a patient at the VAMC in Alexandria, Louisiana. Mr. Mantiply had a history of lumbar spine problems and suffered from gout in his feet and ankles. At trial, he testified that in December 1990, after less than two years of military service as a truck driver, he left the Army because of problems with his back. Nevertheless, Mr. Mantiply spent the next 15 years in various jobs, all of which involved truck driving. VAMC progress notes report episodes of severe back and neck pain throughout the course of Mr. Mantiply's VAMC treatment.

In April 2006, Mr. Mantiply presented at the VAMC emergency room with left-knee pain after reportedly hearing and feeling his knee snap. A magnetic resonance imaging test ("MRI") showed an oblique tear through the posterior horn of the medial meniscus. On May 25, 2006, Mr. Mantiply underwent an arthroscopy and debridement of the left knee. The post-operative diagnosis was "[f]rayed medial meniscus." (Joint Exh. 4 at 001379). At trial, Mr. Mantiply testified that he experienced positive results from the surgery and resumed his work as a truck driver three or four days post-operation. However, the medical record reveals that Mr. Mantiply was hospitalized from May 28–31, 2006, with a diagnosis of post-procedure bleed. VAMC progress notes report mild swelling of the left knee, edema, and dried blood near the surgical site, but no erythema, active bleeding, or drainage. (Joint Ex. 4 at 001367–51). On or about

3

September 11, 2006, Mr. Mantiply obtained new employment doing custom exhaust and radiator work at Pineville Muffler and Radiator in Pineville, Louisiana.

### B.   May 2008 Arthroscopic Knee Surgery

Mr. Mantiply was asymptomatic with respect to his knee until August 2007, when he again presented at the VAMC with left-knee pain. At trial, he described the sensation as a shooting pain emanating from the kneecap and testified that it did not feel like gout pain. Another MRI was performed, and the results were without contrast. On October 4, 2007, Mr. Mantiply was seen by Dr. Joseph Hoffman, a board-certified orthopaedic surgeon at the VAMC. Dr. Hoffman testified that he had worked in private practice for 30 years before coming to the VAMC. Upon examination of Mr. Mantiply's left knee, Dr. Hoffman noted a full, painless range of motion "with slight pain on the patellofemoral compression," tenderness on palpation of the kneecap, no ligament dysfunction, and no joint tenderness. (Joint Exh. 4 at 001184). He injected Mr. Mantiply's knee with cortisone and Marcaine, instructed him to do quadriceps-strengthening exercises, and advised him to return in two months, but did not consider surgical treatment at this time.

Five days later, Mr. Mantiply saw Dr. Michael Brunet, an independent, board-certified orthopaedic surgeon at Mid-State Orthopaedic and Sports Medicine Center in Alexandria, Louisiana. Dr. Brunet observed tenderness at the medial joint line, minimal swelling, poor quadriceps tone, full range of motion, and ligament stability. (Joint Exh. 3 at 010167). In connection with his examination, Dr. Brunet made the following recommendation: "It is unlikely that [Mr. Mantiply] is going to be able to function as a truck driver and I have recommended that he not return back to work." (Id.). When Mr.

Mantiply saw him again on November 6, 2007, Dr. Brunet reiterated his previous recommendation. On cross-examination, however, Mr. Mantiply did not recall these visits or Dr. Brunet's recommendation that he stop working as a truck driver.

On February 14, 2008, Mr. Mantiply returned to the VAMC orthopaedic clinic to see Dr. Hoffman. Mr. Mantiply reported "snapping" and giving out of his knee identical to what he experienced in April 2007, and did not appear to have benefitted from the cortisone shot or home exercise program. (Joint Exh. 4 at 001119). At trial, Dr. Hoffman said he did not re-examine Mr. Mantiply's knee but did recommend a repeat arthroscopy of the left knee. Moreover, the evidence shows that Mr. Mantiply was scheduled for lumbar spine surgery at the Shreveport Veterans' Affairs Medical Center ("VA") for the following month, but he decided to postpone that procedure because of his nerves.

Mr. Mantiply underwent an arthroscopic partial medial meniscus repair to the left knee at the Alexandria VAMC on May 21, 2008. Dr. Hoffman's post-operative diagnosis was "torn medical meniscus, left knee." (Joint Exh. 4 at 001084). The procedure was outpatient, and Mr. Mantiply was taken home by his son that same day. Dr. Hoffman gave him Lortab for pain and discharged him with a knee immobilizer, which he was advised to use until his first post-operative visit. There is no issue concerning the need for or performance of this procedure.

### C.    Post-Surgery Complications and Treatment

On May 26, 2008, five days after the operation, Mr. Mantiply presented at the VAMC emergency room with complaints of left-knee pain, bleeding from the surgery puncture, swelling, and pressure in the knee. The ER nurse did not observe any active

bleeding but noted that the area surrounding the puncture was "boggy" and that the left foot and area below the left knee were "cool to touch." (Joint Exh. 4 at 001079). The ER physician, Dr. Stephen Fitzgerald, observed mild edema upon examination of Mr. Mantiply's knee and aspirated 12 ccs of blood, which was not sent for culture. Dr. Fitzgerald's diagnostic impression was "hematoma." (Joint Exh. 4 at 001075). He placed Mr. Mantiply on an antibiotic and told him to follow-up with Dr. Hoffman the next day. At discharge, Mr. Mantiply was instructed to "[t]ake Amoxicillin 500 mg every 8 hours until all are gone." (Joint Exh. 4 at 001075).

As instructed, Mr. Mantiply reported to the VAMC orthopaedic clinic on May 27, 2008. Dr. Hoffman documented that the patient had "an unremarkable post[-]op course until 24 hours ago when he noted increased drainage from the knee. Came to ER . . . Has mild pain in the knee." (Joint Exh. 4 at 001074). On examination of the knee, he observed "drainage of serous fluid[1] with no evidence of purulence[2] or even turbidity from an injection site on the lateral aspect of the knee." (Id.). Dr. Hoffman advised Mr. Mantiply to continue taking his antibiotic and to come back in two days for his routine post-operation visit. However, he did not submit the drainage for culture and sensitivity testing. At trial, Dr. Hoffman explained that the drainage was emanating from a small hypodermic needle site where he had injected pain medication, and not from the surgical portals. He did not believe a culture was necessary because the drainage appeared to be normal joint fluid. Dr. Hoffman further testified he did not see any signs of infection

---

[1]  Clear, thin fluid.

[2]  Discharge of pus.

during this visit. When asked why he kept Mr. Mantiply on amoxicillin, Dr. Hoffman testified that a patient should continue a course of antibiotics for at least five to seven days to prevent bacteria from developing a resistance to the antibiotic.

Mr. Mantiply returned to the clinic for his regularly scheduled visit on the morning of May 29, 2008, with complaints of constant left-knee pain, a current pain level of seven on a ten-point scale, limited activity, and inability to sleep. On examination, Dr. Hoffman noted "no further drainage from the injection site" and "very minimal swelling of the knee." (Joint Exh. 4 at 001072). He removed Mr. Mantiply's dressing, instructed him to begin range-of-motion and quadriceps-strengthening exercises and to come back in one week for suture removal. Dr. Hoffman testified that he saw no irregularities during this visit, and that Mr. Mantiply's recovery seemed to be progressing normally.

Later that evening, Mr. Mantiply presented at the VAMC emergency room complaining of more knee drainage. While the ER nursing notes report "no redness or drainage," Dr. Fitzgerald did note serous drainage. (Joint Exh. 4 at 001070–71). Mr. Mantiply was told to continue taking his medications and to follow-up with Dr. Hoffman as scheduled. From his review of the ER records, Dr. Hoffman did not see any indication of an infectious process, such as redness or swelling, and he acknowledged that the exercises he had advised Mr. Mantiply to perform could have pushed out the drainage and caused some swelling.

The next day, Mr. Mantiply twice called the VAMC emergency room to relate that his left knee "was still having a lot of drainage," which had soaked through his dressing and was "running down his leg." (Joint Exh. 4 at 001068). The VAMC nurse noted that

Mr. Mantiply would be coming in for a dressing change, but there is no evidence of a VAMC visit on that date. At trial, Mr. Mantiply testified that he was instructed to change his bandages, but he did not recall the nurse asking him to come in at that time.

On June 4, 2008, Mr. Mantiply made a third trip to the ER and was treated by Dr. Daphne Del Valle. He reported constant left-knee pain, which increased with pressure, a current pain level of six, and fluid inside his knee. On physical examination, Dr. Del Valle observed swelling of the lateral left knee and serous drainage. A knee x-ray revealed "a moderate/large suprapatellar joint effusion" and "soft tissue swelling/edema anteriorly and laterally." (Joint Exh. 4 at 001062). After this work-up, Mr. Mantiply was discharged with an ace bandage and instructions to use two crutches for ambulating, be non-weight bearing, elevate his left leg, and keep his orthopaedic clinic appointment for the following day.

From his review of the medical record, Dr. Hoffman did not believe anything else should have been done for Mr. Mantiply. Dr. Hoffman said he was not concerned about the swelling in Mr. Mantiply's knee as a sign of infection because it was difficult to determine from an x-ray whether the swelling was caused by fluid in the knee or by inflamed and thickened synovial tissue. He also acknowledged that Mr. Mantiply's x-ray revealed "old Osgood-Schlatter disease," which causes swelling over the base of the kneecap. (Id.).

Mr. Mantiply returned to the VAMC orthopaedic clinic for his second post-operation visit on June 5, 2008, and reported "no current pain, no pain in the last 7 days." (Joint Exh. 4 at 001060). Dr. Hoffman observed "drainage of clear synovial fluid from a

hypodermic needle injection site on the lateral aspect of his [left] knee" and made the following notation: "This is a very strange course of events, one which I have not seen previously; [patient] states he has been taking antibiotics prescribed for him in the ETU on 5/26, apparently amoxicillin, but is taking it sporadically." (Joint Exh. 4 at 001059). While he did not aspirate the drainage for culture and sensitivity testing, Dr. Hoffman did obtain a complete blood count test ("CBC"), which revealed a white blood cell count of 12,800. (Joint Exh. 4 at 000627). He also changed Mr. Mantiply's dressing, continued his amoxicillin prescription, and advised him to resume his home exercise program and to return in one week for suture removal. At trial, Dr. Hoffman testified that Mr. Mantiply's drainage did not look infected, and that he would have performed an irrigation and debridement or open synovectomy on Mr. Mantiply's knee if he had seen clear evidence of infection, such as significant swelling, more redness, and purulent drainage. Although not documented in his progress notes, Dr. Hoffman further testified that he thought Mr. Mantiply was experiencing an acute exacerbation of gout in the left knee, which is best treated with a cortisone injection. Dr. Hoffman said he also considered Mr. Mantiply's lumbar spine problems as a possible source of the left-knee pain and swelling.

On June 7, 2008, Mr. Mantiply presented at the VAMC emergency room with complaints of severe burning and sharp pain in the left knee after exercising and a current pain level of eight. He recalled telling VAMC personnel that he felt hot and nauseous, which symptoms he had not experienced after his previous arthroscopic surgery, but was told his symptoms were normal. The ER nurse noted that Mr. Mantiply

was "ambulatory on crutches" and had a "moderate amount of swelling in the left knee." (Joint Exh. 4 at 001055). However, no erythema or drainage was observed. According to the medical record, Mr. Mantiply was given Tylenol #3 for pain management and was then discharged from the ER.

The following day, Mr. Mantiply returned to the ER by ambulance with complaints of knee drainage and a current pain level of nine after he reportedly passed out from severe pain in his left knee. (Joint Exh. 4 at 001051). Dr. Fitzgerald, the ER physician, observed no ecchymosis or visible drainage but did find left-knee edema and warmth. (Joint Exh. 4 at 001048). An x-ray of Mr. Mantiply's knee revealed "[s]mall pockets of air . . . on the lateral view," which had not been "seen on the examination 4 days earlier" and indicated "[p]ossible interarticular gas." (Joint Exh. 4 at 000536). But according to the x-ray report, "[c]linical correlation [was] needed to exclude a gas[-]forming infection." (Id.).

Mr. Mantiply was admitted to the hospital for inpatient observation and treatment, and remained hospitalized at the VAMC until June 11, 2008. Upon admission, he was seen by Dr. John Clement, who observed that his knee was swollen, hot, not red, and tender to palpation. Review of the medical record also reveals an elevated white blood cell count of 15,100. (Joint Exh. 4 at 000626). Dr. Clement noted that Mr. Mantiply had a "vagal reaction and syncope from pain" and placed him on the telemetry floor for monitoring. (Joint Exh. 4 at 001034).

At trial, Mr. Mantiply said he repeatedly requested Dr. Hoffman's presence during this hospitalization. However, he did not see Dr. Hoffman until the morning of June 9,

2008, when Dr. Hoffman observed a small effusion[3] of the left knee, a "small ecchymotic area[4] on the anterior aspect of the knee," and "slight inflammation about a puncture wound on the lateral aspect of the knee." (Joint Exh. 4 at 001028). In connection with his examination, Dr. Hoffman made the following notation: "Will perform an arthrocentesis of the knee, remove his surgical sutures and observe. The persistence of the drainage on the lateral aspect of the knee was very strange and while this has now ceased, this constellation of [symptoms] and signs is very strange." (Id.). Mr. Mantiply was also seen by Dr. Uzvalatha Ganji, who observed edema and "localized erythema with elevated temperature on the left side [of the knee] where . . . it was draining in the past." (Joint Exh. 4 at 001027).

Later that day, Dr. Hoffman drew 8 ccs of serous fluid from Mr. Mantiply's knee joint, which he submitted for culture, injected his knee with cortisone and Marcaine, and removed his surgical sutures from "well-healed puncture wounds." (Joint Exh. 4 at 001023). However, the June 11, 2008 culture report states: "Culture Results: few staphylococcus aureus ["staph"] beta lactamase positive," with a demonstrated resistance to penicillin, and "Gram Stain: no organisms seen." (Joint Exh. 4 at 000651). On direct examination, Dr. Hoffman testified that he did not wait for the culture results before administering a cortisone injection because he wanted to give Mr. Mantiply some relief from what he thought was gout pain. He also testified that he did not observe

---

[3] Swelling.

[4] Bruise.

11

increased drainage, increased swelling, increased pain, or other signs of worsening infection following the injection.

On June 10, 2008, Dr. Ganji changed Mr. Mantiply's antibiotic from ampicillin to clindamycin because of his increased white blood cell count of 16,600. (Joint Exh. 4 at 000626, 001018–19). The next day, Dr. Ganji observed less erythema and an improvement in Mr. Mantiply's white blood cell count, which had decreased to 13,800. Mr. Mantiply testified that he began to sense some improvement in his knee at this time. However, Dr. Ganji reported "left knee swelling and infection" and that Mr. Mantiply's "synovial fluid [was] positive for MRSA [methicillin-resistant staphylococcus aureus]." (Joint Exh. 4 at 001006–08). Mr. Mantiply was discharged on June 11, 2008, with a ten-day supply of clindamycin and instructions to return to the clinic in one week.

Mr. Mantiply saw Dr. Hoffman again on June 19, 2008, at which time Dr. Hoffman noted some range of motion issues: "[Patient] continues to have problems with his [left] knee that are very puzzling, i.e[.] persistent though markedly decreased synovial fluid drainage from the neddly puncture wound on the lateral aspect of the knee and now has difficulty and in fact inability to straighten his [left] knee." (Joint Exh. 4 at 001000). On physical examination, Dr. Hoffman observed a small effusion, pitting edema of the left foot and leg and an active range of motion of 20-100 degrees. He also documented that Mr. Mantiply's culture results showed "a few staph aureus organisms," but that his gram stain was negative. He advised Mr. Mantiply to continue taking his antibiotic and to follow up in three weeks, but did not recommend an irrigation and debridement or open synovectomy procedure. This was Mr. Mantiply's final visit with Dr. Hoffman.

Based on his examination and review of the medical record, Dr. Hoffman thought Mr. Mantiply's knee damage was the result of an acute attack of gouty arthritis. He was aware Mr. Mantiply had a history of gout in his feet and ankles, and testified that it was not unusual for such a patient to later develop gout in the knee. Moreover, he interpreted the culture results to show a skin contaminant, rather than infection in the knee joint, given that no organisms were seen on the gram stain and only a few staph organisms were present in the culture. However, Dr. Hoffman did admit he never tested Mr. Mantiply for gout, and that he failed to note a differential etiology of gout in Mr. Mantiply's chart but wished he had.

### D.    Facts Regarding July 2008 Surgery and Dr. Brunet's Treatment

On June 26, 2008, Mr. Mantiply saw again saw Dr. Brunet at the outside clinic. Dr. Brunet testified via deposition that Mr. Mantiply was unable to straighten his knee and had complaints of left-knee pain, night sweats, fever, and a diminished appetite. Dr. Brunet also noted that Mr. Mantiply "fell onto the anterior aspect of his knee about a week ago." (Joint Exh. 3 at 010129). On examination, he observed left-knee swelling, "boggy pre-tibial edema," "some subcutaneous edema and edema drainage laterally," bluish discoloration, and that Mr. Mantiply's knee was "pretty well fixed and comfortable at about 65° of knee flexion." (Id.). His impression was that Mr. Mantiply had differential etiology of infectious synovitis or gouty synovitis with a persistent wound complication, and he was concerned that the purple discoloration might represent a subcutaneous abscess. Dr. Brunet recommended that Mr. Mantiply undergo an open synovectomy procedure as quickly as possible and advised him to seek

13

treatment at the Veterans Affairs Medical Center ("VA") in Shreveport, New Orleans, or Houston. Moreover, Dr. Brunet opined that "if the historical account of what is going on with [Mr. Mantiply's] knee is accurate, then I think this man has had less than optimal medical care." (Id.).

On July 3, 2006, Mr. Mantiply contacted the VAMC, requesting a referral to a private orthopaedic physician. In connection with his request, a VAMC nurse noted the following:

> Returned call to patient after discussing w/ PCP that orthopedic doctor in specialty clinic would be responsible to consult if needed[.] Patient states he was told that Dr. Hoffman was out of the office[.] Patient states he has seen [private] orthopedic surgeon and was told he needed surgery to correct problem[.] Transferred patient to surgery service to check to see who was covering for Dr. Hoffman.

(Joint Exh. 4 at 000994). At trial, Mr. Mantiply recalled Dr. Brunet telling him that he would lose complete use of his leg if he waited to seek treatment. Mr. Mantiply also testified that his orthopaedic appointment had been cancelled because Dr. Hoffman had gone on vacation for fifteen days, and that he thought his new appointment time would have placed him beyond the waiting period that Dr. Brunet had considered necessary for continuous treatment.[5] (Joint Exh. 4 at 000990–91, 000994).

On July 5, 2008, Mr. Mantiply presented at the VAMC emergency room with complaints of constant, sharp left-knee pain, which increased with walking or standing, and a current pain level of six. He testified that his left knee was also locked at this time.

---

[5]   According to Dr. Hoffman, he was only on vacation for four days over the July 4 weekend. He further testified that in his absence, emergency orthopaedic patients were referred to Rapides Regional Medical Center or Cabrini Hospital, whereas non-emergent orthopaedic patients were referred to the Shreveport or Houston VA.

Dr. Charles Roberts, the ER physician, observed left-knee swelling, a small crusting area over the left knee, no increased temperature or significant redness, a sedimentation rate of 98, 60 degrees of flexion, and that any attempt to increase flexion or extension resulted in pain. (Joint Exh. 4 at 000990–91). Dr. Roberts then aspirated a small amount of serous drainage for culture and sensitivity testing, but the culture results demonstrated no growth. After this work-up, Dr. Roberts determined that Mr. Mantiply required additional surgery and referred him to an orthopaedic surgeon at the Houston VA. He also continued Mr. Mantiply on clindamycin and instructed him to return to the Alexandria VAMC in two days "to be admitted for orthopaedics." (Joint Exh. 4 at 000985).

When Mr. Mantiply reported to the VAMC on July 7, 2008, he again requested a consult with Dr. Brunet. According to the ER nurse, Mr. Mantiply said the following:

> I had [surgery] on my [left] knee on May 21 of 08. Since then I have not been able to walk or extend my leg. I need a consult to see a [private] ortho Dr. Brunet. Dr. Hoffman did my [surgery] here. He is out until the 15th. My PCP said they could not put in the consult. I called the chief of staff and he said I could go to the ER to get the consult. Dr. Brunet says that if I don't have [surgery] within the next week I will never be able to use my knee again. Dr. Brunet will do [surgery] on 7/11 if consult is in.

(Joint Exh. 4 at 000984).

On July 9 and 18, 2008, Greg Bolton, a VAMC physician's assistant, called Mr. Mantiply to offer him orthopaedic treatment in Houston.[6] According to the medical record, Mr. Bolton offered to arrange the orthopaedic consult, as well as Mr. Mantiply's transportation to the Houston VA. He also informed Mr. Mantiply that the VAMC would

---

[6] The evidence shows the Alexandria VAMC initially offered Mr. Mantiply orthopaedic treatment at the Shreveport or Houston VA. However, Mr. Bolton was subsequently notified the Shreveport VA would not have an orthopaedist perform the surgery. Accordingly, Mr. Mantiply's only option was to go to the Houston VA for orthopaedic treatment.

not pay for a private orthopaedic surgeon because such treatment was available within the VA system, and that Mr. Mantiply would have to pay for private treatment himself. (Joint Exh. 4 at 000980–81). He noted that Mr. Mantiply "verbally understood and stated that he wanted to [pursue] outside treatment by a private orthopedist." (Joint Exh. 4 at 000980). At trial, Mr. Mantiply testified that the VAMC did not bring in or send him to another orthopaedic physician in Dr. Hoffman's absence. However, on cross-examination, he acknowledged that VAMC personnel worked with him to find another VA location where he could see an orthopaedic physician. He also admitted that he declined the offer for treatment at the Houston VA because he was concerned about leaving his son, a juvenile diabatic, at home. Mr. Mantiply explained that Casey had been hospitalized for diabetic ketoacidosis, and that he would check on Casey during the night while he was sleeping.

The medical record reveals that Mr. Mantiply saw Dr. Brunet again on July 15, 2008, and underwent an open synovectomy at Cabrini Hospital on July 23, 2008. During the July 15 visit, Dr. Brunet observed "a knee contracture of about 60°" and "a tiny bit of drainage laterally with no redness and no warmth." (Joint Exh. 3 at 010128). His pre-operative diagnosis was chronic infected knee or chronic gouty synovitis, and he indicated that if Mr. Mantiply "has an infection[,] he may need to be on extended antibiotics." (Id.). Following the surgery, Dr. Brunet reported that "[t]here was angry synovium that was evident, as well as a fluid that was very turbid but did not [look] like gross pus," and that "the articular cartilage itself was not necrosed and did not appear grossly to be a pyogenic infection that would destroy the hyaline cartilage." (Joint Exh.

3 at 010208). He also obtained a culture of tissue and fluid samples from the surgery, which culture showed no infection. (Joint Exh. 2 at 010103–04, 010118). Dr. Brunet's post-operative diagnosis was again chronic synovitis, either septic or gout in nature. He testified via deposition that although there was no active infectious process at this time, the infection was "burnt out" and "had already done its -- its dirty deed," leaving Mr. Mantiply "with an inflammatory contracted knee." (Brunet Deposition, Pl. Exh. 1 at pp. 11, 46). However, in subsequent notes, he attributes Mr. Mantiply's condition to chronic gout, rather than infection, which he explained as "an error on my part." (Brunet Deposition, Pl. Exh. 1 at p. 76; see also Joint Exh. 3 at 010127, 010130, 010148).

Mr. Mantiply continued to receive treatment for his left knee until early 2009. According to Dr. Brunet, Mr. Mantiply's knee contracture persisted during this period and was "aggressively treated" with physical therapy. (Brunet Deposition, Pl. Exh. 1 at p. 13). On August 5, 2008, after his first follow-up visit with Dr. Brunet, Mr. Mantiply returned to the VAMC for physical therapy based on a prescription from Mid-State Orthopaedic. His initial evaluation revealed severe range-of-motion limitations and left-quadriceps weakness, and he continued physical therapy at the VAMC until August 26, 2008, when Dr. Brunet began serial casting to improve his range of motion.  (Joint Exh. 3 at 010128; Joint Exh. 4 at 000956–80). While Mr. Mantiply later resumed physical therapy at Louisiana Physical Therapy Centers of Pineville, he was discharged on January 12, 2009, as a result of his absence for several weeks. (Joint Exh. 3 at 010192).

The medical record reveals that Mr. Mantiply had regained some flexion and almost full extension by the end of 2008. However, Dr. Brunet testified that "from that

point forward, . . . it was pretty much a stable course. Not much in the way of change. There was some variation in the degree of flexion but not dramatically " (Brunet Deposition, Pl. Exh. 1 at p. 14). The medical record also reveals that Mr. Mantiply continued to experience pain, swelling, and warmth in his left knee. During a follow-up visit in November 2008, Dr. Brunet noted there was "[n]othing to suggest an infectious process," and he injected Mr. Mantiply's knee with cortisone. (Joint Exh. 3 at 010132). Dr. Brunet subsequently reported that Mr. Mantiply was "still recovering from his synovectomy and intermittent flare up of his gout," but his knee was "a lot better" than on previous visits. (Joint Exh. 3 at 010131).

Mr. Mantiply last saw Dr. Brunet on February 11, 2009, at which time Dr. Brunet observed about 5 to 10 ccs of mild swelling, fairly significant quadriceps atrophy, and that Mr. Mantiply lacked 10 degrees of extension. (Joint Exh. 3 at 010148; Brunet Deposition, Pl. Exh. 1 at p. 14). In deposition, Dr. Brunet testified that Mr. Mantiply "was very limited in what he could do." (Brunet Deposition, Pl. Exh. 1 at p. 14). He further explained that, while Mr. Mantiply had regained some flexion and almost full extension, his diminished range of motion persisted because of a degenerative process in his knee.

### E.    Plaintiffs' Testimony Regarding Post-Surgical Course

Following the May 2008 surgery, John Mantiply was cared for by his son, Casey. Mr. Mantiply testified that he was bedridden for about a week, after which time he used two crutches and arm walking canes for ambulatory support. He recalled pain, redness, heat, and fluid in his left knee, which were unlike any complications he had experienced after his first arthroscopic knee surgery or as a result of his pre-existing gout. Mr.

Mantiply claimed he reported all of these symptoms when he presented at the VAMC, but was told his condition was normal. When asked about his medications, Mr. Mantiply did not recall telling Dr. Hoffman that he took his amoxicillin sporadically. He testified that he took the medications his son gave him, and believes he took the amoxicillin. He also testified that he was allergic to amoxicillin and reported this allergy to the VAMC. However, from this Court's independent review, the medical record does not appear to support this assertion.

Mr. Mantiply further testified that he used crutches for approximately one or two months after the initial surgery, but was using arm walking canes by the time he saw Dr. Brunet. He began using crutches again after his second surgery in July 2008. While Mr. Mantiply believes the second surgery helped him, he continued to have difficulty walking or sitting for long periods of time. He recalled spending most of his time lying on the couch and having to crawl up the stairs because he was unable to walk. In December 2008, he attempted to return to work at Pineville Muffler, but was unable to stand because of swelling in his knee.

Mr. Mantiply also recalled that walking on crutches and a partially-flexed knee caused additional strain on his back. According to the medical record, he developed radiating pain and numbness down his left leg and was found to have an L4/L5 herniated disc with nerve root encroachment. He underwent lumbar surgery at the Houston VA in July 2010, and cervical spinal fusion surgery in December 2011. However, Mr. Mantiply testified that he did not notice an improvement after the lumbar surgery. In July 2011, Mr. Mantiply participated in a compensation and pension examination with

VAMC physician Dr. Leila Angel, who concluded that his "level of back and leg pain preclude[d] him from being able to secure and maintain substantially gainful employment,'" and that his "ability to adequately perform sedentary employment would also be hampered by a high level of pain and daily pain meds in being [able] to focus on the task at hand." (Pl. Exh. 1, Deposition Exh. B4 at pp. 288–89).

Moreover, Mr. Mantiply experienced suffered marital difficulties, a decreased sexual relationship, and depression subsequent to his May 2008 surgery. According to the medical record, Mr. Mantiply was diagnosed with depression in October 2008 and a mood disorder because of his general medical condition in March 2009. When questioned about his depression at trial, Mr. Mantiply denied feeling depressed because of his pre-existing back pain and indicated that the primary cause of his depression was his knee condition. However, the medical record reveals that, during a compensation and pension exam on August 24, 2009, Mr. Mantiply reported

> anxiety and depression secondary to his service connected back injury. . . . He also indicate[d] sciatic nerve damage and heart blockage. . . . This individual stated that he began to have serious mental problems about 2 years ago. He indicated that when he was in the military, a physician manipulated his back and created a great deal of pain. . . . [He] indicated that his mental problem are directly connected to his pain and inability to function.

(Joint Exh. 5).

Mrs. Melissa Mantiply admitted she was not present during Mr. Mantiply's post-operation visits with Dr. Hoffman or his trips to the emergency room because she was working two jobs. She recalled, however, that Mr. Mantiply had trouble sleeping and often complained about his knee, which was red and draining pus. She estimated she

cleaned and dressed his knee approximately three or four times a day, depending on how rotten the pus smelled. Mrs. Mantiply also was aware of her husband's pain because of the way he walked and his general mood. She recalled that he was unable to sit or stand for long periods of time, and that he crawled up the stairs when she was unable to assist him. When asked about his depression, Mr. Mantiply testified that her husband did not go outside and had little social interaction after the May 2008 surgery. She also testified that his depression caused a strain in their marital relationship and almost led to their divorce.

Casey Mantiply, who was 20 years old at the time of trial, testified that he went to the VAMC with his father during the times relevant to this trial because Mrs. Mantiply was working two jobs to cover the expenses of his diabetic care. He recalled picking up two medications after Mr. Mantiply's outpatient surgery on May 21, 2008. While Casey admitted he did not read the prescription labels, he thought one medication was for pain and the other, which had to be taken every four to six hours, was an antibiotic.[7] On June 8, 2008, Casey called 911 after witnessing Mr. Mantiply's collapse. He specifically recalled that a large amount of green and yellow pus was forcibly expelled from Mr. Mantiply's knee before he passed out, and testified that he cleaned the pus before going to the VAMC. Casey also said he picked up three prescription bottles, one of which contained pain medication, when Mr. Mantiply was discharged on June 11, 2008. Casey admitted that, while he continued to give Mr. Mantiply the same medication he had received from the VAMC in May 2008, he did not give Mr. Mantiply the second

---

[7] According to Dr. Hoffman, he only prescribed Mr. Mantiply pain medication at the time of the May 2008 surgery.

medication, which he believes was a stronger dose of amoxicillin, because of a warning label on the bottle.

### F.    Mr. Mantiply's Condition and Circumstances at Trial

At the time of trial, John Mantiply walked with a partially-flexed left knee and sometimes used a cane for walking assistance. Mr. Mantiply testified that he was taking pain medication "as needed," but he still estimated his left-knee pain as a "four" or "five" on a ten-point scale. He also testified that his previous back injury continued to bother him and caused lower extremity radicular pain. The pain, which did not improve following his July 2010 lumbar surgery, limited his abilities to walk and bend over. However, Mr. Mantiply explained that the problems he had with his left leg after the May 2008 surgery were different than those he experienced as a result of his back condition or his pre-existing gout. While he did not know whether his back or his knee caused him more trouble, he further testified that walking with a partially-flexed knee made his back more symptomatic. On cross-examination, Mr. Mantiply admitted he had not seen a physician for knee treatment since early 2009 because Dr. Brunet had informed him that nothing more could be done for his knee. Mr. Mantiply also admitted he was no longer participating in physical therapy or a home exercise program. In addition to knee and back pain, Mr. Mantiply continued to complain of depression, anxiety, difficulty walking or standing for long periods of time, and loss of interest in activities. He had been seeing a psychologist at the VAMC and was taking antidepressant medication at the time of trial.

Despite his depression and subsequent marital difficulties, Mr. Mantiply was still married to and living with Melissa Mantiply, his wife of over twenty years. Mrs. Mantiply was a full-time nursing student at Northwestern State University and was not employed at the time of trial. She testified that Mr. Mantiply was unable to walk around their neighborhood or stand for extended periods of time, but that he drove her to and from school and helped with household chores and gardening when she asked. Mrs. Mantiply explained that she tried to make her husband more active when they were together but did not want to push him. She also felt that his mental status had improved slightly and testified that she was able to have conversations with him. However, she did indicate that Mr. Mantiply was still suffering from depression and had not fully resumed his social interaction.

### G.    Expert Testimony[8]

####   1.    *Michael Brunet, M.D.*

The discovery deposition of Dr. Michael Brunet, who did not testify at trial, was entered into evidence without objection. Dr. Brunet took Mr. Mantiply's medical history directly from the patient and did not recall the documents he relied on in preparing his report. Dr. Brunet opined that the VAMC and Dr. Hoffman breached the applicable standard of care in a number of particulars. In his opinion,

> Mr. Mantiply had obvious warning signs of potential or extant infection at least by May 26th which if reacted to according to the standard of care would have in all likelihood resulted in quick recognition and appropriate

---

[8]   Although these witnesses were not officially tendered as experts in the field of orthopaedic surgery, neither party raised an objection to their qualification as such. Therefore, the Court accepts Dr. Michael Brunet and Dr. Stanley Foster as experts in the field of orthopaedic surgery.

hospitalization, irrigation and debridement, and administration of appropriate intravenous antibiotics. Because of the continuous delay and failure to see to the appropriate diagnosis and care of Mr. Mantiply on top of the injection of steroids into an infected knee, he has sustained a permanent painful and disabling deterioration of the joint.

(Brunet Report, Pl. Exh. 1, Exh. B2 at p. 3).

As previously noted, Dr. Brunet testified, and the medical record confirms, that there was no active infection in Mr. Mantiply's knee when Dr. Brunet performed the open synovectomy procedure. Dr. Brunet also testified that he did not find any overt pus and that the hyaline cartilage did not appear to be damaged at the time of the surgery. Nevertheless, Dr. Brunet believes a previous infection had already damaged Mr. Mantiply's knee, and that Mr. Mantiply had "less than optimum medical care" at the VAMC. (Joint Exh. 3 at 010129).

In deposition, Dr. Brunet admitted that drainage is a potential complication after an arthroscopy and typically occurs within three days of the surgery. However, he felt that Mr. Mantiply's drainage five or six days post-operation was "abnormal and should have increased the degree of concern and investigatory efforts of his physicians at the VA[MC]." (Brunet Report, Pl. Exh. 1, Exh. B2 at p. 1). As to the standard of care, Dr. Brunet essentially testified that the signs of infection should not have eluded Dr. Hoffman and should have been met with a more rapid response and more aggressive treatment. In this regard, Dr. Brunet agreed that the failure to culture the aspirated drainage on May 27 and the failure to aspirate and culture Mr. Mantiply's subsequent drainage to determine the presence of infection were omissions breaching the standard of care. When asked about the hematoma aspiration on May 26, Dr. Brunet testified that

the decision to culture the blood was "a judgment call more than anything else." (Brunet Deposition, Pl. Exh. 1 at p. 52). However, he felt that Mr. Mantiply's subsequent clinical picture was clearly that of a septic knee joint and testified that "[m]ost orthopaedists . . . would consider that there might be an infectious process. How can you rule that out? You aspirate it, then culture it." (Brunet Deposition, Pl. Exh. 1 at p. 54). He further elaborated stating: "[I]f it crossed his mind that gout was a potential . . . you certainly haven't ruled out an infection, and it could possibly be gout, [so] you pursue it. And [sending the aspirate for analysis] pretty much rules that out right away." (Brunet Deposition, Pl. Exh. 1 at p. 20). Dr. Brunet also suggested that the VAMC's failure to provide a back-up orthopaedist for Dr. Hoffman was a breach of the standard of care:

> Q.   And there's only one orthopaedist with no backup at the VA. Do[es] the VA have any responsibility to do anything with [Mr. Mantiply] at that point?
> A.   We do in private practice.
> Q.   This is standard?
> A.   That's the point I was making.

(Brunet Deposition, Pl. Exh. 1 at p. 91).

Specifically addressing Dr. Hoffman's treatment, Dr. Brunet felt that the injection of cortisone into a potentially infected knee joint without performing a culture was a breach of the standard of care:

> Q.   . . . [D]id you have a problem with that injection?
> A.   The injection of steroid in the face of possibilities of infection: absolutely.
> Q.   Right. But we don't know, at this point, based on this culture result, if he has staph or if it's --
> A.   Exactly.
> Q.   -- a contaminant; correct?
> A.   Exactly. Can you take a chance? No.

Q.      Do you ever see any other culture, in the V.A. or in your own
        records, that shows that he had staph or any infection?
A.      Let me answer your question this way. If I have a post-op effusion
        with some drainage that's persistent, and I aspirate, and I get a
        questionable culture, then the reasonable thing to do is culture it
        again. To put the steroid in there, that masks things. That's just not
        appropriate. And to blow it off as a lab error, I think, is an error.

(Brunet Deposition, Pl. Exh. 1 at pp. 70–71). The expert did not agree with Dr. Hoffman's

interpretation of the July 11 report as showing a skin contaminant. In fact, he testified

that beta-lactamase positive staph is not generally a skin contaminant and that Dr.

Hoffman should have performed another culture or a scope of Mr. Mantiply's knee to rule

out an infection diagnosis:

A.      [Y]ou can consider that it may be a contaminate, but then you have
        to look at the big picture. And the big picture is a man that's with
        swollen, painful knee. It has drainage. That has an elevated white
        count. Not many people would interpret that as being a . . .
        contaminate or . . . would be cavalier enough to say, well, that's a
        contaminate; there's no infection without pursuing it further, even
        to the point of scoping the knee.
                                    ****
A.      [I]f you consider it a contaminant, then it still behooves you to prove
        it is a contaminant by repeating the aspiration and repeating the
        culture. And if you get two positives with a few staphs, then you
        know that's a real infection and not something that's a contaminant.

(Brunet Deposition, Pl. Exh. 1 at pp. 35, 82–83).

       In addition, Dr. Brunet indicated it was not within the standard of care to

prescribe Mr. Mantiply amoxicillin or ampicillin, given the nature of his infection:

Q.      . . . If a beta-lactamase-positive staph aureus is resistant to
        penicillin, it is also going to be resistant to amoxicillin and
        ampicillin; is that correct?
A.      That's more likely than -- yes.
Q.      Okay. So, giving that medication in the face of a penicillin resistant
        beta-lactamase-positive staph aureus, especially orally, to an
        individual is not going to do much good; is it?

26

> A.   I don't think that's the standard of care.  If you have an infected joint [that is beta-lactam-positive], an oral amoxicillin is not . . . going to work.

(Brunet Deposition, Pl. Exh. 1 at pp. 21–23). While Dr. Brunet agreed that clindamycin was an appropriate antibiotic to treat Mr. Mantiply's infection, he opined that the infection should have been treated more aggressively, at least as of Mr. Mantiply's June 8–11 hospitalization, and that the physician's order changing Mr. Mantiply's antibiotic to clindamycin was not enough. In particular, he faulted Dr. Hoffman for his failure to perform an irrigation and debridement or open synovectomy procedure in light of the June 11 culture report revealing the presence of staph in Mr. Mantiply's knee joint. He explained that the toxins produced by the staph "chew up" articular cartilage in the knee joint, and that a wash-out debridement is necessary to eradicate the bacteria, as well as the "toxins of the staph itself." (Brunet Deposition, Pl. Exh. 1 at p. 25).

Dr. Brunet also agreed that the June 11 culture report probably did not indicate the presence of MRSA. However, he testified that the majority of orthopaedists would feel the need to perform a wash-out debridement of the knee, regardless of the type or virulence of the bacterium. He emphasized that Mr. Mantiply had (1) frequent complaints of drainage, swelling, pain, and redness, (2) documented knee drainage a week after surgery, (3) an elevated, "crescendoing" white blood cell count, (4) a sedimentation rate of 66, and (5) an x-ray showing a large patellar effusion, all of which indicated an infectious process in the knee joint. (Brunet Deposition, Pl. Exh. 1 at p. 67). When asked about the July 5 culture results showing no growth, Dr. Brunet explained that the culture

was performed after Mr. Mantiply was prescribed clindamycin, and that the infection

was not necessarily eradicated:

> A.   . . . [H]e's on antibiotics at this point.
> Q.   Right.
> A.   And to have drainage that comes out as no growth is not terribly unusual.
> Q.   Right. But what I'm asking is, at that point, we're not seeing the staph-positive culture; correct?
> A.   The culture's a negative --
> Q.   Right.
> A.   -- at that point. But does that mean the staph's eradicated? No. . . . What it means is, the antibiotic that comes over in the fluid inhibits . . . the bug [from] grow[ing] in the petri dish.
> Q.   Right.
> A.   So he could still have an infection that's still present.

(Brunet Deposition, Pl. Exh. 1 at pp. 74–75).

Finally, Dr. Brunet testified that "the significant disability and pain which disables Mr. Mantiply from employment and is permanent in nature results from the damage to the structures of the joint from chronic and significant infection together and in conjunction with a chronic, painful, permanent onset of gout in the knee." (Brunet Deposition, Pl. Exh. 1 at p. 27). He explained that a staph infection causes damage "within the first several weeks," and that an infectious "trauma" to the knee joint can aggravate preexisting gout and make the knee more susceptible to gout. (Brunet Deposition, Pl. Exh. 1 at pp. 27, 80). While he acknowledged that Mr. Mantiply could have suffered some joint damage prior to the June hospitalization, Dr. Brunet believes the impact of the infection would have been lessened if a timely diagnosis had been made and the infection had been treated appropriately:

> Q.   If this had been aggressively treated on May 26th or certainly on June the 8th with the wash-out debridement, IV antibiotics, and had been nipped in the bud at that time, and the production of

28

toxins by the bacteria halted, could the severity of the damage done to Mr. Mantiply's knee have been lessened?

A.   I think it would have been lessened. It probably would have been some -- some infection prior to getting it under control that it had probably done some harm. How to quantitate that, I don't think anybody can. But I think the longer the treatment regime persisted then - - then the more damage that was done until the infection had kind of come under control.  On the other hand, he did not believe Mr. Mantiply's continuation of physical therapy would have lessened the damage to his knee joint.

* * * *

Q.   -- at some point you say you don't have a problem, really, until [Mr. Mantiply] comes in on the June 9th hospitalization. If he had had [sic] the staph that we're talking about for these couple of weeks beforehand, is it possible, by the time you're having a problem with what they're doing at the VA, the damage has already been done?

A.   It's possible.

Q.   So we don't --

A.   Here's the deal. We don't know that, you know. He was never given a chance.

Q.   But you can't say, as we sit here today, that it wasn't done by that point in time?

A.   Well, again, this is for assumption purposes, that time frame, [if] it was treated in a timely fashion, the diagnosis was made and treated. Still could have had some joint damage at that point from that. That's where the complication is. I think it would have lessened the impact of the infection had it been treated appropriately.

(Brunet Deposition, Pl. Exh. 1 at pp. 26, 80).

When asked about the effect of Mr. Mantiply's knee deficits on his pre-existing back condition, Dr. Brunet testified that knee and back pain are "synergistic in the sense that one aggravates the other," and that walking on a partially-flexed knee "probably made [Mr. Mantiply's back pathology] worse." (Brunet Deposition, Pl. Exh. 1 at p. 86). Dr. Brunet also testified that Mr. Mantiply is unable to secure and maintain gainful employment because of the level of back and leg pain he experiences. In the expert's view, Mr. Mantiply is mobility impaired, and even traveling to and from a place of

29

employment to perform sedentary work would be difficult because of his pain and his inability to sit or stand for prolonged periods of time.

### 2.    *W. Stanley Foster, M.D.*

Dr. Stanley Foster, a board-certified orthopaedic surgeon, was hired by counsel for the Government to conduct an independent medical evaluation of Mr. Mantiply. When he saw Mr. Mantiply on September 19, 2011, Dr. Foster noted that the patient lacked 26 degrees of extension, flexed to 95 degrees, and had significant atrophy of the left leg, which he attributed to septic arthritis. Dr. Foster also prepared an expert report and offered deposition testimony on behalf of Plaintiffs. He reviewed multiple radiographs of Mr. Mantiply's knee, VAMC medical records, and an April 18, 2010 letter from Dr. Brunet in preparing his opinion, but did not review Dr. Brunet's medical records or Dr. Hoffman's deposition testimony.

In his report, Dr. Foster concluded that "Mr. Mantiply developed a methicillin-resistant staphylococcus aureus infection of the left knee" and that "[t]he delay in appropriate orthopaedic treatment [at the VAMC] has led to long term sequelae for Mr. Mantiply." (Stanley Deposition, Pl. Exh. 2 at pp. 18–19; Deposition Exh. 2 at p. 3). He cited Dr. Hoffman's failure to aspirate and/or culture the drainage from Mr. Mantiply's knee, his failure to treat Mr. Mantiply with appropriate IV antibiotics and aggressive irrigation and debridement, and the administration of a cortisone injection into a potentially-infected knee without waiting for culture results as omissions and actions

breaching the standard of care applicable to orthopaedic surgeons.[9] When asked whether this caused Mr. Mantiply's long-term impairment and disability, Dr. Foster responded in the affirmative.

In deposition, Dr. Foster acknowledged that infection is a known complication of an arthroscopy, and that the decision to culture the hematoma aspiration "would be more of a judgment call." (Foster Deposition, Pl. Exh. 2 at p. 47). However, like Dr. Brunet, he disagreed with the manner in which Dr. Hoffman and the VAMC treated Mr. Mantiply once he presented with signs of infection. Dr. Foster essentially echoed Dr. Brunet's testimony that drainage six days post-operation is not expected, and that it should have increased Dr. Hoffman's level of concern and investigatory efforts. He indicated that Dr. Hoffman should have "at least" performed a culture and/or gram stain of the drainage, in addition to changing Mr. Mantiply's antibiotic:

> Q.      . . . [I]s that a judgment call of the physician based on what he sees in the fluid in the guy's knee presentation at the time, or is that something that's a standard of care written down, you come in six days after surgery, you've got to do this?

---

[9]  Dr. Foster testified as follows:

> Mr. Mantiply developed a methicillin-resistant staphylococcus aureus infection of the left knee. The procedure that was performed was appropriate, meaning the arthroscopic procedure for the meniscus. Mr. Mantiply did return to the emergency room on numerous occasions. He returned in the early morning hours of May 26th, and there was a bloody drainage or bloody aspirate that was obtained. He was started on amoxicillin. He was referred to the orthopedic clinic that morning, where he was seen by Dr. Hoffman. Dr. Hoffman saw this gentleman on numerous occasions and should have at least cultured or aspirated his knee and placed him on appropriate antibiotics, treated him with aggressive debridement, either arthroscopically or open. He should have been hospitalized for I.V. antibiotics and thorough irrigation and debridement. Certainly I do not feel that an injection of corticosteroids in the knee was appropriate, and the delay in appropriate orthopedic treatment has led to the long-term sequelae for Mr. Mantiply.

(Foster Deposition, Pl. Exh. 2 at pp. 18–19).

31

A.      Well, you come in six days after surgery and you've got a hematoma that's draining, and somebody has aspirated it, placed you on amoxicillin, and you know that amoxicillin not only is not going to treat staph but it also doesn't penetrate the joints and the bones that well, you would at least certainly want to change it to something that would, one of the cephalosporins and/or obtain a culture or at least a gram stain of the fluid that's draining from there.

Q.      So, then, even if you didn't do a culture at that point, he may have just been able to change the antibiotic? Is that what you're saying?

A.      I would have at least done a gram stain.

(Foster Deposition, Pl. Exh. 2 at pp. 48–49). Dr. Foster also felt that the administration of a cortisone injection breached the standard of care, given Mr. Mantiply's history and the indications of infection (e.g., "swelling, erythema, warmth or bogginess, and inordinate pain"), because the immunosuppressive actions of glucocorticoids can cause an infection to thrive. (Foster Deposition, Pl. Exh. 2 at p. 28).

Upon review of Mr. Mantiply's June 11 culture report, Dr. Foster testified that Mr. Mantiply's infection did not appear to be MRSA. (Foster Deposition, Pl. Exh. 2 at pp. 69–70). He agreed, however, that the failure to hospitalize Mr. Mantiply for IV antibiotics and a wash-out debridement in light of that report breached the standard of care. Dr. Foster opined that MRSA and staph aureus cause the same inflammatory response and damage to the joint or bone, and that Mr. Mantiply should have been hospitalized for either type of bacterium. He also agreed that Mr. Mantiply's symptomatology—"[e]dema, erythema and warmth, and the leakage of fluid, which, if cultured, reveals bacteria"—establishes a diagnosis of post-operative infection. (Foster Deposition, Pl. Exh. 2 at p. 20). Dr. Foster was not aware that Mr. Mantiply reported taking his amoxicillin sporadically, but he responded in the negative when asked whether this would have affected Mr. Mantiply's culture results. He further testified that amoxicillin

32

would not "have done [Mr. Mantiply] any good" because his infection was beta-lactamase positive, which is penicillin-resistant and, as such, should also be considered amoxicillin-resistant. (Foster Deposition, Pl. Exh. 2 at pp. 24–25).

While Dr. Foster acknowledged that gout "could have been" Mr. Mantiply's "problem in this case all along," he agreed with Dr. Brunet's conclusion that the more likely diagnosis was a bacterial infection, which required aggressive and rapid response. (Foster Deposition, Pl. Exh. 2 at pp. 75–76). Indeed, Dr. Foster testified that the damage to Mr. Mantiply's knee would have been lessened if the infection had been timely diagnosed and appropriately treated following a prompt culture of the serous drainage:

> Q.   And if the blood had been cultured or the drainage, which continued, sooner . . . based on this guy's history, with eight or nine emergency room visits before he finally left and went to Dr. Brunet, that had they cultured this within the first week of his complains of bleeding and drainage and inordinate pain, which was even acknowledged by Dr. Hoffman, that they would have found the bug and been able to treat it and greatly reduce the morbidity and the resulting damage to the knee?
> A.   Yes.
> Q.   And that was a deviation from the standard of care, was it not?
> A.   Yes.

(Foster Deposition, Pl. Exh. 2 at pp. 27–28).

Finally, when asked about Mr. Mantiply's ability to work, Dr. Foster testified that

> certainly [Mr. Mantiply] won't be able to perform any job that requires standing for any long periods of time or walking any long distances. He'll be limited in his ability to go up and down steps or to do any type of climbing or anything that requires him to kneel or squat.

(Foster Deposition, Pl. Exh. 2 at p. 14). He also agreed that Mr. Mantiply's long-term knee deficits "more or less rule[] out what he has done in the way of work . . . the truck driving and the muffler shop work" because such jobs involve repetitive flexion and extension

33

of the left knee, "which hurts with weight-bearing . . . [and] with walking." (Foster Deposition, Pl. Exh. 2 at p. 15). However, he did acknowledge that Mr. Mantiply could "probably do some type of sedentary job" with some restrictions or accommodations, such as "the ability to get up and move about as he deems necessary [and] to use whatever aide he may need to." (Foster Deposition, Pl. Exh. 2 at p. 44).

## III.   Law and Analysis

### A.   Liability

This case is properly before the Court under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, which authorizes suits against the United States for personal injury or death caused by the negligence or wrongful act of a government employee "under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred." Hannah v. United States, 523 F.3d 597, 601 (5th Cir. 2008); see also 28 U.S.C. §§ 1346(b)(1), 2674. Under the FTCA, liability for medical malpractice extends to the Government "in the same manner and to the same extent as a private individual under like circumstances" and is controlled by state substantive law. 28 U.S.C. § 2674; Estate of Sanders v. United States, 736 F.3d 430, 435 (5th Cir. 2013). Accordingly, Louisiana medical malpractice law governs this dispute.

Under Louisiana law, the plaintiff in a medical malpractice action has the burden of proving, by a preponderance of the evidence:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the

34

> plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injures that would not otherwise have been incurred.

La. R.S. 9:2794. In other words, to prove medical malpractice, the plaintiff must establish: (1) the relevant standard of care; (2) a violation of that standard of care; and (3) a causal connection between the alleged negligence and the resulting injuries. Johnson v. Morehouse Gen. Hosp., 63 So. 3d 87, 95-96 (La. 2011).

As a general rule, expert testimony is necessary to establish the applicable standard of care and a breach of that standard of care. Samaha v. Rau, 977 So. 2d 880, 884 (La. 2008) (citations omitted). But when the alleged acts of negligence concern a particular medical specialty,

> then only physicians in that specialty may offer evidence of the applicable standard of care. In other words, to succeed in a medical malpractice claim against a medical specialist, the plaintiff must offer testimony of the applicable standard of care in the particular specialty of the allegedly negligent doctor and the proffered expert must specialize in that peculiar field.

Cleveland ex rel. Cleveland v. United States, 457 F.3d 397, 403–04 (5th Cir. 2006). Although causation is not expressly included among the elements for which expert testimony is required, "typically expert testimony is required to prove causation when the resolution of that issue is not a matter of common knowledge." Gleason v. La. Dep't of Health & Hosp., 33 So. 3d 961, 966 (La. App. 2d Cir. 2010).

Louisiana jurisprudence provides additional guidance for the Court regarding interpretation of the evidence in medical malpractice cases:

> The physician's conduct is always evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with the benefit of hindsight.
>
> When medical experts are called to testify, the views of such expert witnesses are persuasive, although not controlling, and any weight assigned to their testimony by the trier of fact is dependent upon the facts on which the opinion is based as well as the expert's professional qualifications and experience. The trier of fact must assess the testimony and credibility of all the witnesses and make factual determinations regarding these evaluations.

Thibodaux v. Leonard J. Chabert Med. Ctr., 981 So. 2d 686, 689–90 (La. App. 1st Cir. 2007).

### 1.    *Breach of the Standard of Care*

Based on our review of the facts and testimony outlined above, we find that Dr. Hoffman, an orthopaedic surgeon, violated the applicable standard of care when he failed to culture Mr. Mantiply's drainage and failed to prescribe a more appropriate antibiotic prior to June 9–10, 2008. Additionally, Dr. Hoffman failed to recognize the obvious warning signs of infection and to institute the appropriate testing early on so that aggressive treatment, including the administration of appropriate IV antibiotics and a wash-out debridement of the knee, could be implemented.

Both experts opined that, although the decision to culture the hematoma aspirate on May 26 was a clinical judgment, Mr. Mantiply's subsequent knee drainage was abnormal and required prompt testing to determine the presence of infection. Dr. Brunet indicated that Mr. Mantiply's knee drainage and his "unusual" post-surgical course

should have alerted Dr. Hoffman to the possibility of infection. He described Mr. Mantiply as exhibiting "obvious warning signs of potential or extant infection" and testified that "most orthopaedists," when presented with serous knee drainage one week post-arthroscopy, "would consider that there might be an infectious process." (Brunet Deposition, Pl. Exh. 1 at pp. 25, 54). Dr. Brunet further testified that Dr. Hoffman should have pursued his differential etiology of gout by culturing the knee drainage. Dr. Foster similarly testified that the standard of care required Dr. Hoffman to perform a culture prior to commencing antibiotic treatment. Dr. Foster, the Defendant's expert, stated that, at the very least, he would have performed a gram stain of Mr. Mantiply's knee drainage, and that simply changing Mr. Mantiply's antibiotic would not have been enough.

The Court further finds that the Dr. Hoffman breached the standard of care when he administered a cortisone injection into Mr. Mantiply's knee. Both experts opined that Mr. Mantiply's symptomatology indicated at least a potential infection, and that a cortisone injection was an improper response to this possibility. Dr. Brunet noted that injecting a steroid into a potentially infected knee can mask the presence of infection, thus making it more difficult to treat (Brunet Deposition, Pl. Exh. 1 at pp. 70–71), and Dr. Foster stated that cortisone can actually cause an infection to thrive. (Foster Deposition, Pl. Exh. 2 at p. 20).

Finally, the Court finds that Dr. Hoffman's failure to perform a wash-out debridement following the June 11 culture results indicating the presence of staph in Mr. Mantiply's knee was a breach of the standard of care. This treatment was necessary to

eliminate the infection in Mr. Mantiply's knee, and both experts opined that it should have been performed even if the culture report did not indicate the presence of MRSA.

Dr. Foster opined that Mr. Mantiply should have been treated with "aggressive debridement," and hospitalized for antibiotics, and that a failure to do this breached the standard of care. (Foster Deposition, Pl. Exh. 2 at p. 19).   Although Dr. Foster testified that Mr. Mantiply's infection did not appear to be MRSA on the June 11 culture report, he stated that Mr. Mantiply should have been hospitalized whether his infection was MRSA or staph aureus. (Id. at pp. 24, 69-70).   Dr. Brunet also agreed that the June 11 culture report probably did not indicate the presence of MRSA.   However, he testified that the majority of orthopaedists would feel the need to perform a wash-out debridement of the knee, regardless of the type or virulence of the bacterium, particularly in light of Mr. Mantiply's symptoms. (Brunet Deposition, Pl. Exh. 1 at pp. 24-25, 67). And when asked about the July 5 culture results showing no growth, Dr. Brunet explained that the culture was performed after Mr. Mantiply was prescribed clindamycin, and that the infection was not necessarily eradicated. (Id. at pp. 74-75)

### 2.   *Causation*

Additionally, we find that Dr. Hoffman's breach of the standard of care was the cause-in-fact of Mr. Mantiply's injuries.   Under duty-risk analysis, the cause-in-fact element generally involves a 'but-for' inquiry which examines whether or not the injury would have occurred "but for the defendant's substandard conduct." Boykin v. La. Transit Co., Inc., 707 So. 2d 1225, 1230 (La. 1998). When there are concurrent causes, the

38

proper inquiry is whether the conduct at issue was a substantial factor in precipitating the accident. See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 720 (La. 1986) (holding the physicians's conduct "must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause."). Because he failed to recognize and thus treat Mr. Mantiply's infection, Dr. Hoffman caused the knee injury that Mr. Mantiply still suffers from today. But for Dr. Hoffman's inadequate response to the suspected infection, the impact of the infection would more likely than not have been less severe (or eliminated), and the damage to Mr. Mantiply's knee would not be as extensive as it is.

In his deposition, Dr. Brunet testified that "the significant disability and pain which disables Mr. Mantiply from employment and is permanent in nature results from the damage to the structures of the joint from chronic and significant infection together and in conjunction with a chronic, painful, permanent onset of gout in the knee." (Brunet Deposition, Pl. Exh. 1 at p. 27). He explained that a staph infection causes damage "within the first several weeks," and that an infectious "trauma" to the knee joint can aggravate preexisting gout and make the knee more susceptible to gout. (Brunet Deposition, Pl. Exh. 1 at pp. 27, 80). While he acknowledged that Mr. Mantiply could have suffered some joint damage prior to the June hospitalization, Dr. Brunet believes the impact of the infection would have been lessened if a timely diagnosis had been made and the infection had been treated appropriately. To reiterate:

> Q.    If this had been aggressively treated on May 26th or certainly on
>       June the 8th with the wash-out debridement, IV antibiotics, and
>       had been nipped in the bud at that time, and the production of

toxins by the bacteria halted, could the severity of the damage done to Mr. Mantiply's knee have been lessened?

A.   I think it would have been lessened. It probably would have been some -- some infection prior to getting it under control that it had probably done some harm. How to quantitate that, I don't think anybody can. But I think the longer the treatment regime persisted then - - then the more damage that was done until the infection had kind of come under control.  On the other hand, he did not believe Mr. Mantiply's continuation of physical therapy would have lessened the damage to his knee joint.

\*\*\*\*

Q.   -- at some point you say you don't have a problem, really, until [Mr. Mantiply] comes in on the June 9th hospitalization. If he had had [sic] the staph that we're talking about for these couple of weeks beforehand, is it possible, by the time you're having a problem with what they're doing at the VA, the damage has already been done?

A.   It's possible.

Q.   So we don't --

A.   Here's the deal. We don't know that, you know. He was never given a chance.

Q.   But you can't say, as we sit here today, that it wasn't done by that point in time?

A.   Well, again, this is for assumption purposes, that time frame, [if] it was treated in a timely fashion, the diagnosis was made and treated. Still could have had some joint damage at that point from that. That's where the complication is. I think it would have lessened the impact of the infection had it been treated appropriately.

(Brunet Deposition, Pl. Exh. 1 at pp. 26, 80).

In his report, Dr. Foster concluded that "Mr. Mantiply developed a methicillin-resistant staphylococcus aureus infection of the left knee" and that "[t]he delay in appropriate orthopaedic treatment [at the VAMC] has led to long term sequelae for Mr. Mantiply." (Foster Deposition, Pl. Exh. 2 at pp. 18–19; Deposition Exh. 2 at p. 3).

While Dr. Foster acknowledged that gout "could have been" Mr. Mantiply's "problem in this case all along," he agreed with Dr. Brunet's conclusion that the more likely diagnosis was a bacterial infection, which required aggressive and rapid response.

40

(Foster Deposition, Pl. Exh. 2 at pp. 75–76). Indeed, Dr. Foster testified that the damage to Mr. Mantiply's knee would have been lessened if the infection had been timely diagnosed and appropriately treated following a prompt culture of the serous drainage:

> Q.   And if the blood had been cultured or the drainage, which continued, sooner . . . based on this guy's history, with eight or nine emergency room visits before he finally left and went to Dr. Brunet, that had they cultured this within the first week of his complains of bleeding and drainage and inordinate pain, which was even acknowledged by Dr. Hoffman, that they would have found the bug and been able to treat it and greatly reduce the morbidity and the resulting damage to the knee?
>
> A.   Yes.
>
> Q.   And that was a deviation from the standard of care, was it not?
>
> A.   Yes.

(Foster Deposition, Pl. Exh. 2 at pp. 27–28).

### B.   Damages

The Fifth Circuit has previously said that the Government is entitled to the protection of the Louisiana malpractice liability cap provision in medical malpractice cases brought under the Federal Tort Claims Act on the theory it was in "like circumstances" with state health care providers. Owen v. United States, 935 F.2d 734, 738 (5th Cir. 1991), cert. denied, 502 U.S. 1031 (1992). Thus, Plaintiff's damages against the Government are capped by the following Louisiana statute:

> The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and costs.

La. R.S. § 40:1299.42(B)(1). The Court notes this cap on damages applies per patient, not per plaintiff. See Coleman v. Deno, 832 So. 2d 1016, 1034 (La. App. 4 Cir. 2002) (citing Armand v. La. Dep't of Health and Human Res., 729 So. 2d 1085, 1094–95 (1999) (holding

41

the cap includes any derivative claims that arise out of the same act of malpractice). "Because the right of action in [a] loss of consortium claim is derived from the primary victim's injuries," recovery is likewise restricted to the per patient limits. Hollingsworth v. Bowers, 690 So.2d 825, 832 (La. App. 3d Cir. 1996).

    1.    *General Damages*

Mr. Mantiply was 39 years old at the time of Dr. Hoffman's treatment. As noted above, Mr. Mantiply had undergone an arthroscopy of the left knee in May 2006, and had a history of gout in his lower extremities and of back and neck pain secondary to a previous back injury. However, his back and gout issues were under sufficient control, such that he was able to perform custom exhaust and radiator work prior to the May 2008 surgery with Dr. Hoffman. Approximately one week after that surgery, Mr. Mantiply experienced drainage, swelling, and severe pain in the left knee, resulting in multiple trips to the VAMC emergency room and a four-day hospitalization, during which time he received IV antibiotics and a cortisone injection. He also experienced mobility impairments subsequent to the surgery and was forced to use crutches and arm-walking canes for ambulatory support. Within two months, Mr. Mantiply underwent another arthroscopy of the left knee with a private orthopaedic surgeon, and then began aggressive physical therapy treatment to improve his range of motion. He continued to seek private orthopaedic treatment until February 2009, at which time Dr. Brunet found his range of motion to be virtually static.

Plaintiffs offered unrebutted testimony as to the excruciating pain Mr. Mantiply experienced following the May 2008 surgery. They explained that Mr. Mantiply's

42

physical condition visibly deteriorated, and that he became unable to walk up the stairs or perform average household tasks and had to rely on his family's assistance. Moreover, Mr. Mantiply was unable to return to work as a result of his knee pain and his pre-existing back injury, which became more symptomatic as a result of his abnormal gait. Mr. Mantiply also suffered some depression subsequent to the May 2008 surgery, for which he began seeing a psychologist and was prescribed anti-depressant medication. At the time of trial, Mr. Mantiply's main complaints were of left-knee pain, lumbar radicular pain, and depression. His knee condition remained relatively unchanged since February and he was being treated with pain medication "as needed."

Under Louisiana law, general damages are "those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money." Fairchild v. United States, 769 F. Supp. 964, 966 (W.D. La. 1991) (quoting Boswell v. Roy O. Martin Lumber Co., 363 So. 2d 506, 507 (La. 1978)). Louisiana jurisprudence provides some guidance regarding damages awards for injuries similar to Mr. Mantiply's. Similar injuries resulted in awards ranging from $100,000 to $250,000.

In Johnson v. Foret, 2014 WL 2771699 (La. App. 3 Cir. June 18, 2014), plaintiff experienced pain, instability, and "significant damage and deterioration" after a physician operated on his "seriously infected right knee." Id. at *14. Award: $100,000, the maximum amount available under the Medical Malpractice Act due to plaintiff's settlement with the Patient's Compensation Fund.

In Pena v. Delchamps, Inc., 960 So. 2d 988 (La. App. 1 Cir. 2007), plaintiff slipped and fell in a grocery store and as a result underwent two knee replacements, experienced post-surgery infection, and eventually developed a "potentially permanent" foot disability. Id. at 990, 995.   Award: $250,000.

In Thibodeaux v. Trahan, 74 So. 3d 850, 861 (La. App. 3 Cir. 2011), plaintiff incurred a torn anterior cruciate ligament and medial meniscus, underwent surgery and physical therapy, but continued to experience "significant" pain as well as limitations on his ability to work. Id. at 860.  Award: $110,000

Based on these cases and Mr. Mantiply's circumstances, we believe that a general damages award of $150,000 is appropriate.

### 2.     _Future Medical Expenses_

Although neither expert witness has recommended a total knee replacement for Mr. Mantiply, the evidence shows he has sustained permanent and disabling damage to his left knee and will most likely continue to require a cane for walking assistance and medication for his pain. However, given the absence of any evidence regarding the potential costs of his future care, the Court would be forced to engage in appropriate speculation and guesswork if it were to assign a monetary value to those claims. Additionally, it appears the expenses associated with Mr. Mantiply's future medical care will be adequately covered through benefits available to him as a veteran.  Therefore, we will not make an award for future medical expenses.

### 3.     _Lost Earnings and Earning Capacity_

Damages for loss of future earning capacity may be awarded for an injury's effect on a plaintiff's ability to earn, even if a plaintiff "may have never seen fit to take advantage of that capacity." Hobgood v. Aucoin, 574 So. 2d 344, 346 (La. 1990).  When making these awards, courts should consider factors such as "plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount the plaintiff probably would have earned absent the injury complained of; and the probability he would have continued to earn wages over the balance of his working life." Odom v. Claiborne Elec. Co-op, Inc., 623 So. 2d 217, 225 (La. App. 2 Cir. 1993).  Future earnings damages are highly speculative and thus difficult to calculate with mathematical exactitude.  Batiste v. New Hampshire Ins. Co., 657 So. 2d 168, 170 (La. App. 3 Cir. 1995).   Nevertheless, plaintiffs must prove these losses with "a reasonable degree of certainty." Mathews v. Dousay, 689 So. 2d 503, 513 (La. App. 3 Cir. 1997).

As noted above, Mr. Mantiply was 39 years old when he presented for treatment to Dr. Hoffman.  He had some physical limitations, but was performing exhaust and radiator work at Pineville Muffler.  Mr. Mantiply submitted evidence that he earned $7,617 during the months he worked in 2008. (Mantiply Income Tax Returns, Pl. Exh. 4). He earned $5,193 at the same job for months worked in 2007. (Id.).  A Veteran's Affairs form for disability benefits states that Mr. Mantiply's income for the twelve months prior to May 23, 2008, was $10,533. (VA Form 21-4192, Pl. Exh. 5).   The better measure of his likely income is the entire one year period preceding his disability.  That amount (May 23, 2007, to May 23, 2008), is $10,533. Dr. Brunet testified that Mr. Mantiply's injuries

"probably preclud[e] any kind of employment" (Brunet Deposition, Pl. Exh. 1 at p. 32) and a physician who assessed Mr. Mantiply at the VAMC concluded that his level of pain would "preclude him from 'being able to secure and maintain substantially gainful employment.'" (Examination by Dr. Leila Angel, Joint Exh. 4 at 002215).  Worklife tables give Mr. Mantiply slightly more than 18 years of additional worklife, from date of disability, and that calculates to an undiscounted amount of $189,594.  However, the present value of the future amount is $180,565.71, using a 3% interest rate, which we find to be reasonable during the relevant period.  Based on this information[10], we believe an award of $ 180,565.71 for lost future earnings is appropriate.

    *4.      Loss of Consortium*

Plaintiffs presented evidence that Mr. Mantiply's physical disabilities and depression had a negative impact on his wife and son. Indeed, both Mr. and Mrs. Mantiply testified that, as a result of his condition, Mr. Mantiply became irritable and lost interest in activities, which caused problems in their marriage and almost led to their divorce. Mrs. Mantiply, who had two jobs at the time of his surgery, became the family's sole provider and performed all household chores. She said she felt a great deal of pressure because she was working 12 hours a day and caring for both her husband and her diabetic son. She also indicated that, although she had worked two jobs prior to the surgery, her stress subsequently worsened as a result of marital and financial difficulties.

---

[10] These calculations are based on United States Department of Labor Worklife Estimates for men born in the same year and with the same level of education as Mr. Mantiply.

Casey Mantiply, who had graduated high school and was working as a part-time manager at AutoZone at the time of trial, testified that he was unable to play high school football because he stayed home to care for Mr. Mantiply. According to Casey, Mr. Mantiply wanted to spend more time with him after the surgery and frequently brought up "the summer he took from me I can never get back." Casey also testified that he saw Mr. Mantiply crawling up the stairs and crying because of his severe left-knee pain, which was difficult to observe. He described Mr. Mantiply as a hard worker and caring father, and did not recall ever seeing him cry prior to the May 2008 surgery.

In Louisiana, loss of consortium damages are available for any one of: "(1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity." Smith v. Escalon, 117 So. 3d 576, 584 (La. App. 2 Cir. 2013).   These claims are derivative of a primary victim's injuries. Ferrell v. Fireman's Fund Ins. Co., 696 So. 2d 569, 576 (La. 1997).   Thus, to recover for loss of consortium, a claimant must prove: the liability of the defendant, resultant damages to the primary plaintiff, and "his or her consequent loss of consortium damages." Peck v. Wal-Mart Stores, Inc., 682 So. 2d 974, 976 (La. App. 3 Cir. 1996).  In cases where spouses experienced difficulties similar to Mrs. Mantiply's, courts in Louisiana awarded sums ranging from $5,000 to $25,000 for loss of consortium.

In Pena v. Delchamps, Inc., 960 So. 2d 988 (La. App. 1 Cir. 2007), a husband took twelve weeks off of work and assumed more household chores after his wife's knee

47

surgery. The couple no longer had intimate relations or engaged in joint social activities. Id. at 995. Award: $25,000.

In Bouquet v. Wal-Mart Stores, Inc., 978 So. 2d 447 (La. App. 1 Cir. 2007), rev'd in part on other grounds, 979 So. 2d 456 (La. 2008), plaintiff's husband could no longer have a sexual relationship with his wife, took on all household responsibilities, and became responsible for his wife's hygiene after underwent surgery relating to a back injury. Id. at 450. Award: $15,000.

And in Daigle v. Legendre, 619 So. 2d 836 (La. App. 1 Cir. 1993), a wife performed husband's household chores for approximately four months and experienced stress from her husband's irritable, depressed mood after his surgery for injuries to his wrist, back, and heel. Id. at 842. Award: $5,000.

For loss of consortium damages to children who, like Casey Mantiply, suffered as a result of their parents' injuries, courts have awarded sums ranging from $1,000 to $5,000.

In Peters v. Williams, 917 So. 2d 702 (La. App. 2 Cir. 2005), a daughter received loss of consortium damages after her father suffered soft tissue injuries. The father was no longer "available to talk [to his daughter] about her problems" and also could not go fishing with her anymore due to his injuries. Id. at 712. Award: $2,000.

In Ibrahim v. Hawkins, 845 So. 2d 471 (La. App. 1 Cir. 2003), a court of appeal affirmed a trial court's award of $5,000 to plaintiff's children for loss of consortium due to their father's rib and shoulder injuries that required surgery and resulted in

psychological therapy for the father. Id. at 475.  Award:  $5,000 (to be shared among plaintiff's children).

And in Robbins v. State ex rel. Dep't. of Labor, 728 So. 2d 991 (La. App. 2 Cir. 1999), three children were awarded loss of consortium damages resulting from their mother's irritability and "inability to engage in activities with the children" caused by her knee injury and subsequent surgeries. Id. at 999. Award: $1,000, $2,000, and $2,500 (separate awards for each child).

Based on these cases and Mrs. Mantiply and Casey Mantiply's losses, we believe loss of consortium awards of $5000 to Mrs. Mantiply and $2000 to Casey Mantiply are appropriate.

###    C.    Apportioning Fault

The Government claims that Plaintiffs' recovery should be reduced by the percentage of Mr. Mantiply's own fault, in failing to take his antibiotics as prescribed and in failing to continue physical therapy. Louisiana's comparative fault scheme is set forth in La. Civ. Code art. 2323, which provides, in pertinent part:

> If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

The Louisiana Supreme Court has summarized the standard for allocating fault as follows:

> In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

Watson v. State Farm Fire & Cas. Ins. Co., 469 So. 2d 967, 974 (La. 1985).

Dr. Foster suggested that Mr. Mantiply should have continued a home exercise program, rather than terminating his physical therapy and other knee treatment in early 2009, but the expert could not say whether this would have improved Mr. Mantiply's current knee condition. Dr. Brunet similarly testified that, although Mr. Mantiply's knee "would probably be a little less symptomatic" if he had completed physical therapy, "the ultimate breakdown of his joint probably would not have had an appreciable affect one way or the other." (Brunet Deposition, Pl. Exh. 1 at p. 79). He stated that, although Mr. Mantiply had regained back some of his flexion by December 2008, he "continued to struggle . . . with a degenerative process, with scarring, with atrophy, and a combination thereof" and "from that point forward . . . it was pretty much a stable course. Not much in the way of change." (Brunet Deposition, Pl. Exh. 1 at p. 14).   Mr. Mantiply's actoins do not rise to the level of negligence which would trigger the comparative reduction;

Based on the above testimony and Louisiana's comparative fault scheme, we will not reduce Mr. Mantiply's recovery based on any fault of his own.

IV.   Conclusion

For the foregoing reasons, this Court renders judgment in favor of Plaintiff, John Mantiply, and against Defendant, the United States of America, in the amount of $330,565.71 plus costs as provided by law; in favor of Plaintiff, Melissa Sue Mantiply, and against Defendant in the amount of $5000 plus costs as provided by law; and in favor of Plaintiff, Casey Adam Mantiply, and against Defendant in the amount of $2000 plus costs as provided by law.

SIGNED on this 30 day of September, 2014 at Alexandria, Louisiana.


DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

51